**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JUDICIAL WATCH, INC.,** | |
| Plaintiff, | |
| v. | Case No. 1:19-cv-00876 (TNM) |
| **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Advanced Biosciences Resources ("ABR") partnered with Planned Parenthood and other abortion providers to dismember fetuses and sell their parts for research. It sold second-trimester livers and thymi for hundreds of dollars apiece. The same for brains, eyes, and lungs. After tacking on fees for services like shipping and cleaning, ABR could collect over $2,000 on a single fetus it purchased from Planned Parenthood for $60. The federal government participated in this potentially illicit trade for years.

Plaintiff Judicial Watch, Inc. sued under the Freedom of Information Act to obtain details from the Food and Drug Agency and the National Institutes of Health—two components of Defendant U.S. Department of Health and Human Services (collectively, "the Government")—on their involvement in this bloody business. The Government produced hundreds of documents, but, as relevant here, redacted some information under FOIA's Exemption 4, claiming that the information is confidential and commercial.

Before the Court are the parties' cross-motions for summary judgment. The Court determines that the Government cannot rely on Exemption 4 to shield this information from

disclosure.  As a result, the Court will deny the Government's motion for summary judgment and grant Judicial Watch's cross-motion.

## I.

In September 2018, Judicial Watch submitted FOIA requests to FDA and NIH.  It asked for information relevant to contracts between the Government and ABR.  Def.'s Statement of Material Facts ("DSMF") ¶¶ 1–2, ECF No. 15.  Judicial Watch's requests to each agency were identical.  It sought these records for the 2013 to 2018 years:

1. All contracts and related documentation between [FDA/NIH] and Advanced Biosciences Resources ("ABR") for the provision of human fetal tissue to be used in humanized mice research.
2. All records reflecting the disbursement of funds to ABR for the provision of human fetal tissue to be used in humanized mice research.
3. All guidelines and procedural documents provided to ABR by [FDA/NIH] relating to the acquisition and extraction of human fetal tissue for its provision to the [FDA/NIH] for humanized mice research.
4. All communications between [FDA/NIH] officials and employees and representatives of ABR related to the provision by ABR to the [FDA/NIH] of human fetal tissue for the purpose of humanized mice research.

*Id.*; Pl.'s Resp. to Def.'s Statement of Material Facts and Further Statement of Facts ("PSMF") ¶¶ 1–2, ECF No. 16.

When no records were released, Judicial Watch sued.  DSMF ¶ 5.  FDA then produced 740 pages of potentially responsive records.  *Id.* ¶ 6.  NIH produced 676 pages.  *Id.* ¶¶ 6, 25. Each set of records was subject to partial redactions under FOIA's Exemption 4, which protects confidential commercial information.  *Id.* ¶ 6; 5 U.S.C. § 552(b)(4).  Judicial Watch challenges these withholdings.  Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. and in Supp. of Pl.'s

Cross-Mot. ("Pl.'s Opp'n/Cross-Mot.") at 8–9, ECF No. 16.[1]  Before the Court are the parties'

cross-motions for summary judgment.[2]

## II.

Courts decide the "vast majority" of FOIA cases on motions for summary judgment.

*See Brayton v. Off. of U.S. Trade Repr.*, 641 F.3d 521, 527 (D.C. Cir. 2011).  To prevail in this

procedural posture, a movant must show that "there is no genuine dispute as to any material fact"

and that it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  A factual dispute is material if it could alter the outcome of the suit under the

substantive governing law.  *Anderson*, 477 U.S. at 248.  And "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party," the dispute is genuine.  *Id.*

"The mandate of . . . FOIA calls for broad disclosure of Government records."  *CIA v.*

*Sims*, 471 U.S. 159, 166 (1985).  Federal agencies must "disclose information to the public upon

reasonable request unless the records at issue fall within specifically delineated exemptions."

*Judicial Watch, Inc. v. FBI*, 522 F.3d 364, 365–66 (D.C. Cir. 2008).  The "nine specific

exemptions" are "construed narrowly in keeping with FOIA's presumption in favor of

disclosure."  *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 869 (D.C. Cir. 2010); *see also FBI v.*

*Abramson*, 456 U.S. 615, 630 (1982) (referring to "the oft-repeated caveat that FOIA exemptions

are to be narrowly construed").

"The agency bears the burden of establishing that a claimed exemption applies."  *Citizens*

*for Resp. & Ethics in Wash. v. DOJ*, 746 F.3d 1082, 1088 (D.C. Cir. 2014).  "[S]ummary

---

[1]  All page citations refer to the page numbers that the CM/ECF system generates.

[2]  The Court has jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

judgment may be granted on the basis of agency affidavits if they contain reasonable specificity

of detail rather than merely conclusory statements, and if they are not called into question by

contradictory evidence in the record or by evidence of agency bad faith." *Pub. Citizen v. HHS*,

975 F. Supp. 2d 81, 94 (D.D.C. 2013) (cleaned up).  Courts review the applicability of FOIA

exemptions de novo.  *King v. DOJ*, 830 F.2d 210, 217 (D.C. Cir. 1987).

### III.

To begin with, the Government says that FOIA's concern is with "the operations or

activities of the government," not private parties like ABR.  Def.'s Mem. in Supp. of Mot. for

Summ. J. ("Def.'s Mot.") at 23, ECF No. 15 (cleaned up).  True enough.  But Judicial Watch's

FOIA request *does* concern "the operations or activities of the government."  Here, ABR was a

supplier of human body parts to the Government and thus is implicated in the Government's

activities.  They were business partners.  Judicial Watch wants to know how the Government

used taxpayer dollars participating in this trade.  This is a far cry from when the Government

only acquires private documents through its role as a regulator or law maker.  *Cf. Pub. Citizen*

*Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1282 (D.C. Cir. 1983) (explaining that companies had

"submitted the data requested by the [plaintiff] to the FDA as part of the agency's investigation

of" the product they manufactured).

This leads us to the crux of the case.  This case concerns FOIA's Exemption 4, which

allows the Government to withhold "trade secrets and commercial or financial information

obtained from a person" that are "privileged or confidential."[3]  5 U.S.C. § 552(b)(4).  Neither

party contends that the withheld information constitutes "trade secrets," so whether Exemption 4

---

[3] Judicial Watch is not challenging the adequacy of the Government's search or its withholdings under Exemption 6.  PSMF ¶¶ 10, 18; Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mot.") at 17–18, ECF No. 15.

applies hinges on whether the withheld information is: (1) "commercial or financial"; (2) "obtained from a person"; and (3) "privileged or confidential." *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290.

Judicial Watch challenges the Government's invocation of Exemption 4 as to two types of information: (A) the names and addresses of ABR's contract laboratories; and (B) unit prices and line-item amounts in contracts between ABR and the Government. *See* Pl.'s Opp'n/Cross-Mot. at 9–15. For the former, Judicial Watch claims that the information is not commercial. *See id.* at 9–10. For the latter, it contends that the information is not confidential. *See id.* at 10–15. The Court agrees on both counts.

## A.

Consider first whether the names and addresses of ABR's contract labs constitute "commercial" information that FOIA's Exemption 4 protects from disclosure.[4] Judicial Watch concedes that the withheld information is "obtained from a person." *Id.* at 8 n.3. And it does not argue that the information is not "confidential." *See id.* at 9–10.

Information is "commercial" and therefore comes within Exemption 4 "if, in and of itself, it serves a commercial function or is of a commercial nature." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002) (cleaned up). That means that "records that actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business, fall within the scope of 'commercial'

---

[4] There is some discussion in the briefing over whether Judicial Watch also challenges the Government's withholding of the names and addresses of ABR's third-party customers. *See* Pl.'s Opp'n/Cross-Mot. at 9; Def.'s Mem. in Opp'n to Pl.'s Cross-Mot. and Reply in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Opp'n/Reply") at 6–7, ECF No. 20. After some initial confusion, the parties seem to agree that Judicial Watch is not raising such a challenge. *See* Pl.'s Reply in Supp. of Cross-Mot. for Summ. J. ("Pl.'s Reply") at 5 & n.1, ECF No. 22.

information." *Pub. Citizen*, 975 F. Supp. 2d at 99 (cleaned up); *see also id.* (explaining that "documents that contain revenue, net worth, income, and EBITDA information are plainly commercial" (cleaned up)).

The exemption covers a broader category of information, too.  It "applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency."  *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006).  But the definition of "commercial" is not boundless—indeed, "the D.C. Circuit has cautioned that, consistent with the narrow construction given to FOIA exemptions, not every bit of information submitted to the government by a commercial entity qualifies for protection under Exemption 4."  *Pub. Citizen*, 975 F. Supp. 2d at 101 (cleaned up).

The Government argues that ABR has a commercial interest in the names and addresses of its contract laboratories.  *See* Def.'s Mem. in Opp'n to Pl.'s Cross-Mot. and Reply in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Opp'n/Reply") at 7–9, ECF No. 20.  For evidentiary support, it cites two sources: (1) an agency declaration; and (2) a letter from ABR to the Government explaining why the redacted information is confidential and commercial.  *See id.* at 7–8.  This evidence falls well short of what the Government needed to show on the commercial prong.

Take the declaration.  Although the Government did not analyze the commercial prong at all in its initial brief, *see* Def.'s Mot. at 25–26, it submitted a supplemental declaration in its combined opposition and reply from a director within the FDA, *see* Suppl. Decl. of Howard R. Philips ("Suppl. Philips Decl."), ECF No. 20-2.  As to the commercial prong, the declaration states:

> Firms like ABR can have a financial interest in the identities of its business relationships and basic commercial operations.  Disclosure of ABR's contract laboratories, for example, could reveal ABR's sources for specialized services that could be an important aspect of ABR's commercial operations.  Companies like

> ABR can also have a financial interest in the identities of their . . . contract laboratories because other companies can poach . . . contract laboratories. For these reasons, FDA routinely redacts the identity of . . . non-public business affiliates (including contractors) because firms often have a financial interest in keeping that information confidential.

*Id.* ⁋ 9; *see also* Def.'s Opp'n/Reply at 7–8 (relying on this passage).

If speculation sufficed, this litany would be fine. But the supplemental declaration says nothing about why ABR in fact has a commercial interest in the names and addresses of its contract labs. Indeed, it appears not to rely on actual concerns raised by ABR at all. It states only in general terms that entities "*like ABR*" "*can have*" or "*often have*" a "financial interest" in such information. Suppl. Philips Decl. ⁋ 9 (emphasis added). And it theorizes about possible consequences that could befall a "[c]ompan[y] like ABR" if the information were disclosed: "other companies can poach . . . [the] contract laboratories." *Id.* Or perhaps disclosure, "*for example*, *could reveal* ABR's sources for specialized services." *Id.* (emphasis added). These generalized observations are not evidence. The Government asserts no commercial interest on behalf of ABR specifically.

ABR's letter gets the Government no further. In response to a letter from the Government asking ABR to confirm that the Government should continue to withhold the information at issue, ABR explained—as to the identities of the contract labs specifically—only the following:

- "[T]he names and addresses of contract laboratories (including the names and identifying information related to specific researchers and facility employees) ABR works with *are in fact confidential commercial information* belonging to ABR, and should continue to be withheld by the FDA as (b)(4) material."
- "With respect to . . . the names and addresses associated with contract laboratories ABR works with . . . , the information at issue is both confidential and *commercial in nature*."
- "Because ABR has both customarily and actually treated this information as private, and *has a commercial interest in the information*, it is appropriately exempted from disclosure under (b)(4) and should be withheld."

Decl. of Katherine Uhl Exs. ("Uhl Decl. Exs.") at 23–24, ECF No. 15-2 (emphasis added); *see also* Def.'s Opp'n/Reply at 7 (relying on this letter). These conclusory assertions do not suggest to the Court, even at the highest level of generality, *why* ABR has a commercial interest in the information. And other statements in the letter pertain only to the confidentiality prong. *See, e.g.*, Uhl Decl. Exs. at 24 ("ABR does not customarily disclose or make publicly available the names and addresses associated with the contract laboratories it works with . . . ."). The Government has thus not met its burden to show that the names and addresses of ABR's contract labs are commercial in nature.

This determination finds support from other cases in this district. For example, in *Public Citizen v. HHS*, the court emphasized that conclusory statements are not enough for the Government to withhold information under Exemption 4. 975 F. Supp. 2d at 103. The court found the agency's declarations lacking, explaining that "the defendant makes only the conclusory statement that '[t]he records contain [the companies'] commercial or financial information'" and that "[t]he *Vaughn* indices offer no additional details on this critical question." *Id.* (cleaned up). The court then looked to the companies' declarations, as they had intervened in the case, and decided that they too were insufficient: "The declarants for the defendants focus on the highly confidential nature of the [withheld information], but do not address the *key issue* of whether this category of withheld documents contains commercial information." *Id.* at 104 (emphasis added). The court ultimately concluded that the Government failed to prove the commercial prong and that it "w[ould] not speculate," given the dearth of information before it. *Id.*

Here, as in *Public Citizen v. HHS*, the Government and ABR provided no specifics on the "key issue" of whether the identities of ABR's contract labs are commercial. It is, of course,

8

plausible that ABR could have a commercial interest in the names and addresses of its contract laboratories.  But neither the Government nor ABR have given the Court a reason why that is the case here.  *Cf. COMPTEL v. FCC*, 910 F. Supp. 2d 100, 117 (D.D.C. 2012) (explaining that statements claiming that information was redacted because it was "competitively sensitive" and would "reveal protected information" were "conclusory assertions" and "insufficient to show that Exemption 4 was appropriately invoked" (cleaned up)).

It was even more important for the Government (or ABR) to address the commercial nature of the names and addresses, given that this type of information is not obviously commercial.  Take *COMPTEL*, where the plaintiff challenged the agency's redaction of the names of certain employees under Exemption 4.  *See id.* at 115–16.  The court assumed that "corporations can have a commercial interest in the names of certain staff," but explained that "it is not a certainty that a corporation would have a commercial interest in the names of every one of its employees"; so, "the [agency] *must state why* this information is commercial in nature." *Id.* at 116 (emphasis added).  The court found that the agency had not met its burden.  *See id.*; *see also Besson v. U.S. Dep't of Com.*, 480 F. Supp. 3d 105, 112 (D.D.C. 2020) (explaining that "a person's identity" is not "the type of commercial information [typically] protected by Exemption 4" so "an agency seeking to withhold employee names by invoking Exemption 4 *must identify specific evidence* demonstrating something unique about the names that logically or plausibly renders them commercial in nature or function" (emphasis added) (cleaned up)).[5]

---

[5] As the Government points out, *see* Def.'s Opp'n/Reply at 8, some cases have dealt only with employee names and addresses.  Here, the Court considers the names and addresses of ABR's contractors.  But even so, the relevant cases do not seem to limit their holdings based on this fact. *See, e.g.*, *Besson*, 480 F. Supp. 3d at 112 ("Courts in this jurisdiction typically have not recognized a person's identity as the type of commercial information protected by Exemption 4." (cleaned up)).  And names and addresses are unlike documents that would be considered "plainly commercial," such as those "contain[ing] revenue, net worth, income, and EBITDA

It bears repeating that this could have been a different case had the Government or ABR adequately explained themselves. But they did not. And ABR did not intervene to defend its interests, as companies have in similar cases. *Cf. Pub. Citizen*, 975 F. Supp. 2d at 91 (explaining that the court had granted the "unopposed motions of [the companies] to intervene"). FOIA favors disclosure, and the burden to avoid disclosure rests with the Government. *See Citizens for Resp. & Ethics in Wash.*, 746 F.3d at 1088. It did not meet that burden here. The Court will grant summary judgment to Judicial Watch on this issue and order the Government to disclose the names and addresses of ABR's contract laboratories pursuant to Judicial Watch's FOIA request.

## B.

Judicial Watch also seeks unit prices and line-item amounts that were redacted from contracts between ABR and the Government. Pl.'s Opp'n/Cross-Mot. at 10–15. The Government argues that it has properly withheld the information under Exemption 4. Def.'s Mot. at 24–25. Judicial Watch contends that the exemption does not apply because the information is not "confidential." Pl.'s Opp'n/Cross-Mot. at 10–11, 14. It does not contest that the information is "obtained from a person" or that it is "commercial." *Id.* at 8 n.3, 10.

The Supreme Court has explained that to discern the meaning of "confidential," it looks to "what that term's ordinary, contemporary, common meaning was when Congress enacted FOIA in 1966." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019). And it "meant then, as it does now, 'private' or 'secret.'" *Id.* at 2363 (quoting Webster's Seventh New

---

information." *Pub. Citizen*, 975 F. Supp. 2d at 99 (cleaned up). In any event, the Court does not rely on these cases for the outcome here. Whether names and addresses of contractors (rather than employees) are *typically* treated as confidential is not determinative. The Government did not meet its burden that Exemption 4 applies either way.

Collegiate Dictionary 174 (1963)).  In *Argus Leader*, the Court held that "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it."  *Id.*

It also explained that another condition might be required for information to be considered confidential—that "the party receiving" the information "provide[] some assurance that it will remain secret."  *Id.*  But the Court left the question open.  *See id.* (stating that "there's no need to resolve" whether "privately held information *lose[s]* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private").[6]

With that said, information cannot be "confidential" if it is already in the public domain. *See CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C. Cir. 1987) ("To the extent that any data requested under FOIA are in the public domain, the submitter is unable to make any claim to confidentiality—a *sine qua non* of Exemption 4."); *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999) ("[I]f identical information is truly public, then enforcement of an exemption cannot fulfill its purposes.").  This exception reflects the commonsense intuition that an open secret is no secret at all.  Thus, under the D.C. Circuit's "public-domain doctrine, materials normally immunized from disclosure under FOIA lose their

---

[6]  The Government argues that FOIA's legislative history should inform the Court's application of the confidentiality prong—specifically, that it helps answer the question that *Argus Leader* left open.  *See* Def.'s Mot. at 23 ("FOIA's legislative history confirms" that the government need not "show that it made assurances of confidentiality in order to establish that the information would be exempt").  While this case does not require the Court to weigh in on this question, the Government's approach runs counter to Supreme Court teaching.  The Court criticized a 1974 D.C. Circuit decision, which relied on legislative purpose and legislative history, as "a relic from a bygone era of statutory construction."  *Argus Leader*, 139 S. Ct. at 2364 (cleaned up).  The Court counseled that it could not "approve such a casual disregard of the rules of statutory interpretation" and that "[i]n statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself."  *Id.*

protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999).

Although the Government bears the burden to show that a FOIA exemption applies, "when a plaintiff contends that allegedly confidential business records are publicly available, *it* 'has the burden of showing that there is a permanent public record of the exact portions' it seeks." *Story of Stuff Project v. U.S. Forest Serv.*, 366 F. Supp. 3d 66, 75 (D.D.C. 2019) (quoting *Davis v. DOJ*, 968 F.2d 1276, 1280 (D.C. Cir. 1992)).   This is so because, "were it otherwise, the government would face the daunting task of proving a negative: that requested information had not been previously disclosed." *Id.* (cleaned up).

### 1.

Judicial Watch does not appear to dispute that, in general, unit pricing could be confidential information.  It instead argues that the pricing information is no longer confidential. Recall that Judicial Watch seeks unit pricing information for the years 2013–2018.  DSMF ⁋⁋ 1– 2.  Judicial Watch contends that this information is in the public domain in two ways: (a) for 2013–2015 records, through several fee schedules appended to a report released by the U.S. Senate's Judiciary Committee; and (b) for 2016–2018 records, through the Government's disclosures in responding to this FOIA request.  *See* Pl.'s Opp'n/Cross-Mot. at 10–15; Pl.'s Reply in Supp. of Cross-Mot. for Summ. J. ("Pl.'s Reply") at 11–15, ECF No. 22.  The Court considers each.

### a.

Before Judicial Watch's FOIA request, the U.S. Senate Judiciary Committee investigated ABR and several other companies.  PSMF ⁋ 33; Def.'s Resp. to Pl.'s Further Statement of Facts ⁋ 33, ECF No. 20-1.  The Committee probed "issues involving the buying and selling of fetal

tissue in violation of 42 U.S.C. § 289g-2."  Decl. of Meredith Di Liberto Exs. ("Di Liberto Decl. Exs.") at 8, ECF No. 16-1.  That statute prohibits transferring human fetal tissue "for valuable consideration," 42 U.S.C. § 289g-2(a)—defined as an amount other than "reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue," *id.* § 289g-2(e).

The investigation generated a report, which found (among other things) that ABR had "received payments for fetal tissue specimens far in excess of their demonstrated costs of the allowable categories" and had not attempted "to contemporaneously determine these relevant costs when setting prices."  Di Liberto Decl. Exs. at 9.  Attached to the report were ABR fee schedules for the years 2010–2015.  PSMF ⁋ 34; *see also* Di Liberto Decl. Exs. at 13–19.[7]  Judicial Watch contends that the redacted pricing information from 2013–2015 corresponds with the fee schedules disclosed by the Committee and thus is in the public domain.  *See* Pl.'s Opp'n/Cross-Mot. at 12.

The Court finds that the fee schedules appended to the Committee's report are enough to put the information that Judicial Watch seeks for the 2013–2015 years in the public domain.  The Government acknowledges that the fee schedules are in the public domain but contends that Judicial Watch is entitled to no more than those precise documents.[8]  *See* Def.'s Opp'n/Reply at 10–12.  But the Government is mistaken.

---

[7]  The Judiciary Committee ultimately referred ABR to the FBI for investigation and potential prosecution.  Di Liberto Decl. Exs. at 11, 21–22.

[8]  The Government released an unredacted version of the 2015 fee schedule during briefing because it was "the only fee schedule in its production that is identical to fee schedules identified in Plaintiff's filings as appended to the Senate Report."  Def.'s Opp'n/Reply at 10 & n.3.

Each of the fee schedules discloses the "per specimen" fee for "fetal cadaverous procurement"—in particular, for "2nd trimester D & E (13-24 weeks)" and "1st trimester aspiration (8-12 weeks)."  Di Liberto Decl. Exs. at 15–16 (2013 fee schedules); *see also id.* at 13–14 (disclosing the same information in the 2014–2015 fee schedules).  The fee schedules also specify pricing for "blood sample procurement," "special processing/preservation" (such as "Tissue 'cleaning'" and "Snap freezing"), "infectious disease screening," and "delivery."  *Id*. at 15–16 (2013 fee schedules); *see also id.* at 13–14 (disclosing the same for 2014–2015).[9]  The information apparent from the fee schedules corresponds with the information that Judicial Watch seeks and that the Government has redacted.

As an example, Judicial Watch cites a 2013 email in which the Government redacted line-item prices for the following information: "Procurement fee for acquisition of one 2nd Trimester Thymus"; "Procurement fee for acquisition of one 2nd Trimester Liver"; "FedEx First Overnight Delivery"; and "EFT/Wire Transfer Fee."  Di Liberto Decl. Exs. at 28; *see also* Uhl Decl. Exs. at 16 (describing this document as an "Email about Procurement fees and attachment of fees for services schedule").  But each of these line items appear on the 2013 fee schedules disclosed in the Judiciary Committee's report.  *See* Di Liberto Decl. Exs. at 15–16 (listing prices for "2nd trimester D & E (13-24 weeks)," "Federal Express First Overnight," and "Electronic Fund Transfer (EFT)").

---

[9]  There are minor differences between the two fee schedules for 2013 (one effective January 1, 2013 and the other effective September 1, 2013) and the 2014 and 2015 fee schedules.  For example, the 2014 and 2015 fee schedules say, "fetal cadaverous *specimen* procurement" instead of "fetal cadaverous procurement."  Di Liberto Decl. Exs. at 13–16 (emphasis added).  The later fee schedules also say, "2nd trimester *specimen* (13-24 weeks)" and "1st trimester *specimen* (8-12 weeks)," omitting the "D & E" and "aspiration" notations that had seemingly referred to how the fetus was aborted.  *Id.* (emphasis added).  These differences appear to be stylistic.

Or take the redacted 2013 fee schedule that the Government disclosed to Judicial Watch. The Government redacted fees—including the per-specimen price for "fetal cadaverous procurement" and the cost for "delivery"—from that document. *See id.* at 29. But it is nearly identical to the 2013 fee schedule disclosed in the Judiciary Committee's report.[10] *See id.* at 16. Consider a side-by-side comparison:



*Id.* at 29 (left); *id.* at 16 (right).

The same is true for the information withheld in other records pertaining to the 2013–2015 years. *See, e.g.*, Suppl. Decl. of Meredith Di Liberto ("Suppl. Di Liberto Decl.") at 3, ECF

---

[10] The Committee report fee schedule omits one line item that is present on the redacted 2013 fee schedule disclosed to Judicial Watch—the pricing for an "Intact Calvarium (8-24 weeks)," which is "the upper part of the human skull." Pl.'s Opp'n to Def.'s Mot. to Correct R. at 3, ECF No. 24. But as Judicial Watch notes, the other line items on these documents are identical. *See id.*

No. 22-1 (an email in which the Government redacted the 2014 per-specimen fee "for the procurement of the Thymus and Liver" and the 2015 "procurement fee for 2nd Trimester samples," as well as shipping and electronic-funds-transfer costs); Di Liberto Decl. Exs. at 31 (a 2015 "Tissue Acquisition Quote" in which the Government redacted the per-sample procurement fees for "2nd Trimester Thymus" and "2nd Trimester Liver," as well as the "FedEx First Overnight" delivery fee).  The unit pricing information for human fetal tissue, as well as shipping and other costs disclosed in the Judiciary Committee report fee schedules— corresponding with the 2013–2015 years—is thus in the public domain.  The Government cannot rely on Exemption 4 to withhold it.

<strong>b.</strong>

As to Judicial Watch's argument over the 2016–2018 years, in responding to Judicial Watch's FOIA request here, NIH released documents disclosing the total cost of transactions between the Government and ABR.  It released "Tissue Acquisition" invoices—from each of the 2016, 2017, and 2018 years—which showed a total price of $680 for one "Thymus, 2nd Trimester" and one "Liver, 2nd Trimester."  Di Liberto Decl. Exs. at 41 (2016 invoice), 39 (2017 invoice), and 53 (2018 invoice); *see also* Decl. of Gorka Garcia-Malene Exs. at 2, 5, ECF No. 15-4 (referencing these documents as a "[t]issue acquisition invoice[s] between [ABR] and NIH").  Judicial Watch asserts that this total—along with other, already disclosed information detailing that ABR charges the same price for all types of fetal tissue that are the same age—puts the per-specimen price in the public domain.  Pl.'s Opp'n/Cross-Mot. at 13–15; Pl.'s Reply at 13–15.

The Court finds that the redacted 2016–2018 per-specimen pricing information is in the public domain.  The unredacted portions of some disclosures here reveal that ABR based its

16

pricing on the age of the fetus, not the type of tissue.  *See, e.g.*, Di Liberto Decl. Exs. at 42 (2016 invoice for "Tissue, 2nd Trimester (1 each of liver and thymus)"); *id.* at 13–19 (fee schedules showing that "per specimen" pricing corresponded with whether the fetal tissue was "2nd trimester" or "1st trimester"); Suppl. Di Liberto Decl. at 3 (referencing the fee "for 2nd Trimester samples").  So according to ABR's pricing scheme, a second-trimester liver costs the same as a second-trimester thymus.  And NIH's disclosures show that the total price for one "Thymus, 2nd Trimester" and one "Liver, 2nd Trimester" was "$680.00."  Di Liberto Decl. Exs. at 41 (2016 invoice); *see also id.* at 39 (2017 invoice), 53 (2018 invoice).  Knowing that ABR priced the tissue according to its age, along with the total cost, makes calculating the per-specimen fee an exercise of simple math.  Because both tissues were the same age and thus the same price, the total price simply has to be divided by the quantity to derive the unit price of $340.  *See* Pl.'s Reply at 13–15.

As Judicial Watch points out, this must be the per-specimen price that the Government redacted from the disclosures unless either "ABR was charging amounts different from its fee schedule or charging individual government agencies different prices."  *Id.* at 13 n.7.  But the Government has not given the Court any reason to believe that the redacted unit prices are somehow different.  Thus, the per-specimen pricing information for second-trimester human fetal tissue corresponding with the 2016–2018 years is in the public domain, and the Government cannot withhold it under Exemption 4.[11]

---

[11]  Judicial Watch is entitled to a narrower set of information for the 2016–2018 years than it is for the 2013–2015 years.  The Court construes Judicial Watch's cross-motion for summary judgment as seeking, for the 2013–2015 years, all records related to ABR fees that the Judiciary Committee report fee schedules rendered publicly available.  *See* Pl.'s Opp'n/Cross-Mot. at 12; Pl.'s Reply at 11–12.  But as to the 2016–2018 years, it seems that Judicial Watch seeks only the information that stems from the NIH's disclosure of total cost: the per-specimen price of second-trimester fetal tissue.  *See* Pl.'s Opp'n/Cross-Mot. at 13–15; Pl.'s Reply at 13–15.

**2.**

**a.**

The Government argues that the information in the public domain does not exactly match the information that Judicial Watch seeks so Judicial Watch is not entitled to it.  *See* Def.'s Opp'n/Reply at 10–12.  The Government is correct that there must be a close fit between the information in the public domain and the redacted information.  *See, e.g.*, *PETA v. HHS*, 901 F.3d 343, 352 (D.C. Cir. 2018) ("[T]he requesting party has the burden of showing that there is a permanent public record of the *exact portions* he wishes to obtain." (cleaned up)); *Cottone*, 193 F.3d at 555 (explaining that the plaintiff met his burden to prove the tapes he wanted "reside in the public domain and mirror precisely the information that he has requested").

But the Government's argument, as applied to the circumstances here, boils down to a requirement that redacted information be in identical form to information in the public domain. *See* Pl.'s Reply at 10.  The public-domain doctrine does not require the Court to favor form over substance.  Binding caselaw shows that the relevant inquiry is whether the *information* is in the public domain, not whether it is also in precisely the same *form*.  *See, e.g.*, *Cottone*, 193 F.3d at 554 ("Under our public-domain doctrine, *materials* normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." (emphasis added)); *Davis*, 968 F.2d at 1280 (stating that the plaintiff "ha[d] not satisfied his burden to point to specific *information* in the public domain" (emphasis added)).

In *Davis v. DOJ*, the D.C. Circuit considered whether the plaintiff was entitled to the disclosure of tapes played in open court.  968 F.2d at 1278–79.  The court held that the plaintiff "ha[d] not satisfied his burden to point to specific information in the public domain" because he did not show which tapes in particular were played—only "that *some* of the tapes were played."

*Id.* at 1280.  To have "obtain[ed] portions of tapes alleged to be in the public domain," the court explained, the plaintiff had to show that "there [wa]s a permanent public record of the exact portions" that he sought.  *Id.*

The Circuit distinguished *Davis* in *Cottone v. Reno*.  In *Cottone*, like *Davis*, the plaintiff sought recordings that were played in open court.  *Cottone*, 193 F.3d at 555–56.  But the Circuit held that the plaintiff in *Cottone*, unlike the plaintiff in *Davis*, met his burden of production because he "demonstrated precisely which recorded conversations were played in open court"; specifically, he put forward the "official transcript of [his] trial" in which the court reporter referred to the audio tapes that "had been 'played for the Court and jury' and subsequently admitted into evidence."  *Id.* at 555.  "With such a specific showing," the court stated, "we are not left to guess which tapes have entered the public domain and which have not."  *Id.*

The court then dispelled the notion that *Davis* had "establish[ed] a uniform, inflexible rule requiring every public-domain claim to be substantiated with a hard copy simulacrum of the sought-after material."  *Id.*  It acknowledged that "it will very often be the case that some type of hard copy facsimile will be the only practicable way for a FOIA requester to demonstrate that the specific information he has solicited has indeed circulated into the public domain."  *Id.*  But the Circuit went on to say that "it would be an empty formalism to insist that [the plaintiff] produce a hard-copy, verbatim transcription of the audio tapes to prove which tapes were played at trial when he has already produced a certified transcript from his trial that indicates precisely which tapes were, in fact, played."  *Id.*

The lesson of these cases is that courts should scrutinize whether the plaintiff has proven that the information sought is in the public domain.  They do not require a plaintiff to produce an exact copy of the redacted information, in the same form, to meet that burden of production.

This principle is further illustrated by *Center for Public Integrity v. U.S. Department of Energy*, 287 F. Supp. 3d 50 (D.D.C. 2018).  There, the court considered redacted portions of emails that the Government had disclosed before in a memorandum and report.  *See id.* at 63.  The court examined the memorandum and report, which had "reveal[ed]" and "describe[d] the [email] exchange" (apparently even quoting portions of it).  *Id.* at 63–64.  The court also "conduct[ed] an *in camera* review of the records in dispute" to conclude that certain "statements contained in the . . . e-mail chain are specific enough, and sufficiently match," the memorandum and report so that they "must be disclosed."  *Id.* at 64; *see also id.* at 64–65 (concluding the same about a different email chain).  Thus, the prior disclosure of the information in the email chain was enough to put at least portions of the emails in the public domain, even though the prior disclosures took a different form—a memorandum and report.

So too here.  Judicial Watch has met its burden to show that the unit pricing information it seeks is in the public domain through the fee schedules appended to the Judiciary Committee report and the Government's disclosures regarding ABR's pricing.  Even though these materials might have disclosed unit pricing in a different form, that does not mean that the *information* is not in the public domain.  In fact, Judicial Watch's showing here seems more akin to the "hard copy facsimile" (that the D.C. Circuit said was sufficient but *not* required in *Cottone*) than the transcript (that the Circuit held was enough).  *Cottone*, 193 F.3d at 555.

This case is therefore unlike *Davis* in two critical ways.  *First*, Judicial Watch has made a "specific showing" of the unit pricing information that is in the public domain so that the Court is "not left to guess which [unit pricing information] ha[s] entered the public domain and which ha[s] not."  *Id.*  For each of the relevant years, Judicial Watch has shown the manner in which the unit pricing information was disclosed.  For 2013–2015, the fee schedules show the unit pricing

for fetal tissue and other services.  And for 2016–2018, the Government's disclosures, including those revealing total cost, have put the per-specimen pricing information for second-trimester fetuses in the public domain.

*Second*, while the plaintiff in *Davis* sought to obtain all tapes played by showing that only "*some* of the tapes were played," *Davis*, 968 F.2d at 1280, Judicial Watch is not seeking information in excess of what it has shown is in the public domain.  Contrast this case to *PETA v. HHS*.  There, the D.C. Circuit held that there was "a material difference between inventory snapshots posted periodically as part of inspection reports by the [agency]" (which were already public) and "the number of nonhuman primates obtained in various shipments" (which the plaintiff sought).  *PETA*, 901 F.3d at 352.  The court explained that the publicly disclosed inventory snapshots did not reveal as much detail as the redacted shipment-by-shipment quantity information, which was "a far more accurate measure of business volume." *Id.* Here, though, Judicial Watch seeks the same unit pricing that is in the Judiciary Committee report and the per-specimen fees that can be easily discerned from the Government's disclosure of the other two critical variables (total price and quantity).  It seeks no more than what is publicly available.

**b.**

The Government more broadly contends that Judicial Watch has not met its burden to prove that the records it seeks lie in the public domain.  *See* Def.'s Opp'n/Reply at 11.  The Government is correct that the burden rests with Judicial Watch to show the public-domain doctrine applies.  *See Story of Stuff*, 366 F. Supp. 3d at 75.  But the Court finds Judicial Watch has met that burden and that the Government has failed to rebut Judicial Watch's showing.

The Government attempts to analogize this case to *Story of Stuff*, but a close comparison reveals why the Government comes up short here.  In *Story of Stuff*, the plaintiff argued that a

report already in the public domain "contain[ed] substantially equivalent—if not identical—information about [the company's] operations." *Id.* (cleaned up). "To counter these claims, the Government submitted a declaration from" the company explaining why the information in the company's confidential materials was different from that in the public report. *Id.* For example, the declaration explained that since the public report's issuance, "a large forest fire [had] completely destroyed [the company's] infrastructure"; thus, the company's confidential materials would "contain information that is substantively and contextually different from that contained in the [public] report." *Id.* (cleaned up). It also noted that "the level of detail contained in the [public report] [wa]s conceptual," but "[b]y contrast, the company's confidential materials [were] far more precise." *Id.* (cleaned up). This Court found it "plausible that [the company] ha[d] confidential diagrams of its operations featuring greater precision and accuracy than those" in the public report and ultimately determined that the plaintiff "ha[d] failed to carry its burden of showing that there is a permanent public record of the information it seeks." *Id.* at 76 (cleaned up).

Here, unlike in *Story of Stuff*, the Government has submitted nothing to convince the Court that the withheld information is any different from the information in the public domain. Had the Government given reason to believe that the redacted information does not match the information already in the public domain—for example, that ABR's prices fluctuated or that it gave discounts for bulk orders—as it did with the declaration in *Story of Stuff*, the outcome here may have been different. But it has not. Judicial Watch has met its burden, and the Government has not rebutted its showing.

*     *     *

In sum, the Court determines that the Government has not met its burden to prove that Exemption 4 applies to shield the names and addresses of ABR's contract laboratories. The Government must therefore disclose this information. The Court also concludes that Judicial Watch has met its burden to show that the unit pricing information it seeks is in the public domain. The Government has not meaningfully responded to this showing or convinced the Court that the redacted information is any different than information in the public domain. It must therefore disclose: (1) any redacted unit pricing information for fetal tissue, shipping, or other fees and services relating to the 2013–2015 years that can be found in the Judiciary Committee report's fee schedules; and (2) any redacted per-specimen pricing information for second-trimester fetal tissue relating to the 2016–2018 years.

Happily for the Government (and ABR), this means that the Court need not reach Judicial Watch's argument that the Government cannot withhold the information at issue because ABR engaged in criminal conduct. *See* Pl.'s Opp'n/Cross-Mot. at 15–17. Recall that it is illegal to transfer "any human fetal tissue for valuable consideration." 42 U.S.C. § 289g-2(a). Judicial Watch contends that the invoices disclosed here show that the Government paid "valuable consideration" to ABR and so the Government cannot keep the withheld information confidential. Pl.'s Opp'n/Cross-Mot. at 15.

"Exemption 4 cannot be used to shield illegal business practices under the guise of confidential business information." *Ctr. for Pub. Integrity v. U.S. Dep't of Energy*, 234 F. Supp. 3d 65, 76 (D.D.C. 2017). The Court is dubious of the Government's argument that this exception could not apply here. *See* Def.'s Opp'n/Reply at 13. There is reason to question the lawfulness of the transactions between the Government and ABR. *See, e.g.*, PSMF ¶ 31; Di Liberto Decl. Exs. at 5 (press release explaining that the Government terminated its contract with

ABR because "HHS was not sufficiently assured that the contract included the appropriate protections applicable to fetal tissue research or met all other procurement requirements"). But because the Court will grant Judicial Watch the relief it seeks on other grounds, it is unnecessary to proceed to discovery or trial on this issue.

## IV.

For all these reasons, the Defendant's Motion for Summary Judgment will be denied,[12] and the Plaintiff's Cross-Motion for Summary Judgment will be granted. A separate Order will issue.

Dated: March 11, 2021

TREVOR N. McFADDEN, U.S.D.J.

---

[12] The Court will also deny the Government's "Motion to Correct the Record." Def.'s Mot. to Correct R., ECF No. 23. The Court construes this filing as a motion for leave to file a sur-reply, as the Government appears to be responding to arguments raised in Judicial Watch's reply. *See id.* at 1. As best the Court can tell, the Government simply puts two documents—which are already in the record—side by side to show that they are not identical and thus that the records Judicial Watch seeks are not in the public domain. *See id.* The Government's request to "correct the record," then, is both unnecessary and inappropriate. And the Court has already rejected the Government's form-over-substance argument. *See supra* Section III.B.2.a. Even were the Court to grant the Government's motion, the outcome here would not change.